JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Robert L. Quigley, M.D.

**DEFENDANTS**
Frankford Hospital of the City of Philadelphia, et al.

**(b)** County of Residence of First Listed Plaintiff   Montgomery
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Philadelphia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney
George Bochetto, Esquire
David J. Perlman, Esquire
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia PA 19102 (215) 735-3900

Attorneys
Joseph Wolfson, Esquire
Stevens & Lee
620 Freedom Business Center, Ste. 200
King of Prussia PA 19406 (610)205-6019

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                               and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☒ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Sherman Act, Section I

Brief description of cause:
Antitrust

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $
Over $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   11/26/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   _____   AMOUNT   _____   APPLYING IFP   _____   JUDGE   _____   MAG. JUDGE   _____

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.**

Address of Plaintiff: Robert L. Quigley, M.D., 814 Conshohocken Rd., Gladwyne PA 19035

Address of Defendant: Frankford Hospital, Knights and Red Lions Roads, Philadelphia PA 19114

Place of Accident, Incident or Transaction: Philadelphia PA

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes ☐   No ☐

Does this case involve multidistrict litigation possibilities?      Yes ☐   No ☒

*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☒ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify)

### ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, George Bochetto, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 11/26/08 _____        27783
                     Attorney-at-Law                  Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 11/26/08 _____        27783
                     Attorney-at-Law                  Attorney I.D.#

CIV. 609 (6/08)

APPENDIX I

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Robert L. Quigley, M.D. | : | CIVIL ACTION |
| v. | : | |
| Frankford Hospital of the City of Philadelphia, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
  and Human Services denying plaintiff Social Security Benefits                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
  exposure to asbestos.                ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
  commonly referred to as complex and that need special or intense management by
  the court.  (See reverse side of this form for a detailed explanation of special
  management cases.)                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    ( x )

| | | |
|---|---|---|
| 11/26/08 | | George Bochetto, Esquire |
| | | David J. Perlman, Esquire |
| **Date** | **Attorney-at-law** | **Attorney for** Plaintiff |
| (215) 735-3900 | (215) 735-2455 | gbochetto@bochettoandlentz.com |
| | | dperlman@bochettoandlentz.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT L. QUIGLEY, M.D. : | |
| : | |
| Plaintiff, : | |
| v. : | |
| : | NO. |
| FRANKFORD HOSPITAL OF THE CITY OF : | |
| PHILADELPHIA AND FRANKFORD : | |
| HEALTH CARE SYSTEM, INC., AKA : | |
| FRANKFORD HOSPITAL-TORRESDALE, : | |
| ROY A. POWELL, FRANCIS J. URICCHIO, M.D.: | |
| PENNSYLVANIA HEART AND VASCULAR : | |
| GROUP, P.C.; RANDY K. METCALF, M.D.; : | |
| BRIAN P. PRIEST, M.D., BUCKS COUNTY : | |
| CARDIOTHORACIC SURGERY, P.C., : | |
| ROGER A. MARINCHAK, M.D., : | |
| SCOTT R. SPIELMAN, M.D., : | |
| STEVEN A. ROBERTS, M.D., : | |
| and JOHN PYM, M.D. : | |
| : | |
| Defendants. : | |
| : | JURY TRIAL DEMANDED |

## COMPLAINT

### I.   NATURE OF ACTION

1.     Although he founded the cardiac program at Frankford Hospital-Torresdale

("Frankford"),[1] Plaintiff, distinguished heart surgeon Robert L. Quigley ("Quigley"), was

harassed and boycotted by colleagues at Frankford, as well as by the Frankford administration, in

an effort to destroy his career and eliminate him as a competitor.  Shockingly, the perpetrators,

Defendants herein, went so far as to threaten patient care in their attempt to dominate the

delivery of cardiac services at Frankford.

---

[1]     "Frankford" shall refer to Frankford Hospital of Philadelphia, Frankford Health
Care Systems, Inc. and any other fictitious name or entity that owns or operates Frankford
Hospital at Knights and Red Lions Roads, Philadelphia, PA 19114.

2.      But one example of their commitment to ruin the founder of Frankford's cardiac program was their conspiracy with pacemaker manufacturers to deny Quigley access to this essential surgical device.  In an appalling abuse of medical judgment, a number of Defendants successfully pressured manufacturers to withhold a pacemaker while Quigley's critically ill patient was anesthetized and awaiting surgery on an operating room gurney.

3.      This action is brought under Section I of the Sherman Act, prohibiting "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce...," as well as under common law causes of action.  This case is related to the earlier filed action of *Quigley v. Powell, et. al,* Philadelphia County Court of Common Pleas, August Term 2007, No. 002895 ("State Action"), in which seven defendants to the instant Sherman Act claims are defendant to certain state law claims.   Here Quigley brings the Federal antitrust claims against the State Action Defendants and names four new Defendants whose involvement was only recently uncovered through third-party discovery in the State Action.  The latter Defendants are subject to state law claims in this action.

## II.   PARTIES

4.      Quigley has been practicing medicine since 1982 and is triple Board certified and re-certified in General Surgery, Surgical Critical Care, and Thoracic Surgery.  He holds a Ph.D. from Oxford and completed his post-graduate medical training at Duke under the direction of David C. Sabiston, Jr., M.D. -- a world renowned authority on open-heart surgery.  Quigley was a Professor of Surgery at Jefferson Medical College and has published approximately 100 articles.

5.      In addition to practicing as a cardiac surgeon, Quigley served in leadership positions in the cardiac section of several hospitals.   In 1998, Quigley was Chairman of

2

Cardiothoracic Surgery at Einstein Medical Center ("Einstein").  At that time, he was selected to establish the cardiac surgery program at Frankford under a contract between Einstein and Frankford.

6.      Frankford is a hospital located at Red Lion and Knights Road, Philadelphia, PA 19114.  Since approximately 2002, Frankford has offered its patients, among other services, the full continuum of cardiac services, including but not limited to, state-of-the-art equipment and technology and experienced cardiologists, cardiac surgeons, and nursing staff.

7.      Defendant, Roy A. Powell ("Powell"), at all times relevant to this Complaint, served in the capacity of, President and Chief Executive Officer of Frankford.

8.      Defendant Francis J. Uricchio, M.D. ("Uricchio") is an interventional cardiologist with privileges to practice at Frankford and has his principal place of business at 9501 Roosevelt Boulevard, Suite 501, Philadelphia, PA 19114.

9.      On information and belief, Defendant Pennsylvania Heart and Vascular Group, P.C. ("PHVG"), located at 9501 Roosevelt Boulevard, Suite 501, Philadelphia, PA 19114, is a physician's practice owned and operated by Uricchio and other physicians, including some of the Defendants herein.

10.     Defendant Randy K. Metcalf, M.D. ("Metcalf") is a cardiothoracic surgeon with privileges to practice at Frankford, and has his principal place of business at 78 South Main Street, Suite 200, Doylestown, PA 18902.  Defendant Metcalf also maintains a place of business at 3998 Red Lion Road, Suite 214, Philadelphia, PA 19114.

11.     Defendant Brian P. Priest, M.D. ("Priest") is a cardiothoracic surgeon with privileges to practice at Frankford, and has his principal place of business at 78 South Main

Street, Suite 200, Doylestown, PA 18902. Defendant Priest also maintains a place of business at 3998 Red Lion Road, Suite 214, Philadelphia, PA 19114.

12. Bucks County Cardiothoracic Surgery, P.C. ("BCCS") is a physician's practice owned and operated by Defendants Metcalf and Priest at 78 South Main Street, Suite 200, Doylestown, PA 18902. Defendant BCCS also maintains a place of business at 3998 Red Lion Road, Suite 214, Philadelphia, PA 19114.

13. Defendant Roger A. Marinchak, M.D. ("Marinchak") is a cardiologist, specifically, an electrophysiologist, with privileges to practice at Frankford and has his principal place of business at 261 Old York Road, Suite 214, Jenkintown PA 19046. He is part of PHVG.

14. Defendant Scott R. Spielman, M.D. ("Spielman") is a cardiologist, also an electrophysiologist, with privileges to practice at Frankford and has his principal place of business at 261 Old York Road, Suite 214, Jenkintown PA 19046. He is part of PHVG.

15. Defendant Steven A. Roberts, M.D. ("Roberts") is a Thomas Jefferson University Hospital cardiologist with privileges to practice at Frankford and has his principal place of business at 9501 Roosevelt Blvd., Philadelphia PA 19114.

16. Defendant John Pym, M.D. ("Pym") is a cardiac surgeon with privileges to practice at Frankford  and has his principal place of business at Main Line Health 100 Lancaster Avenue, 280 Lankenau Medical Science Building, Wynnewood, PA 19096.

### III.  FACTUAL BACKGROUND

**A.** **Certain Defendants Take Control Of The Quigley-Created Cardiac Program While Quigley Continues Practicing Surgery At Frankford.**

17. In 1998, Quigley was Chairman of Cardiothoracic Surgery at Einstein Medical Center ("Einstein").  At that time, he was selected to establish the cardiac surgery program at Frankford under a contract between Einstein and Frankford.  In this role, Quigley was paid $1

4

million annually.  For the first year, to get the program running, he virtually lived at the hospital full-time, training staff and establishing protocols.  The Quigley-created program was successful, almost immediately, from both a medical and economic perspective.

18.     By 2002, when the term of the contract under which Einstein established and ran the Frankford cardiac program ended, Quigley had grown the program into the fourth largest in the region.[1]  It was conducting approximately 350 surgeries annually.  With monthly revenue to the hospital ranging from $30,000 to $60,000 for each surgical case alone, the entire heart program was making the hospital over $100 million annually.

19.     But, when Quigley arrived, there was no heart program to speak of.   The cardiac staff at Frankford consisted only of general cardiologists.  There were no cardiac surgeons, no interventional cardiologists, and no electrophysiologists to implant cardiac devices.   PHVG and its cardiac physicians had been at Frankford for decades, but were unable to provide a full range of cardiac services and generate the revenue both for themselves and Frankford commensurate with doing so.  But for Quigley, Defendants would have been unable to fulfill the potential of Frankford's Certificate of Need, issued by the Commonwealth of Pennsylvania, for the provision of complete cardiac services.

20.     From 1998 through 2007, Frankford proudly displayed Quigley's accomplishments and expertise on its website – that is, his pioneering of beating heart surgery and his national proctorship for multiple cardiovascular device companies.  His image was posted on a billboard near Interstate 95 to attract patients, including out of state patients, and his CV was used to attract Federal money.

---

[1]     Although Quigley's term as Cardiac Section Head ended, as did the contract between Einstein and Frankford, Quigley's contract with Einstein continued through 2004.

21.    Nevertheless, the Frankford environment was hostile to Quigley.  He had arrived on the turf of PHVG.  Jealous of an outsider creating a successful program, even as they were trained by it or otherwise benefited from it, the Defendant physicians wanted to capture it as their own, to the exclusion of Quigley.  Though he created a bonanza for Defendants, they wanted no part of him.

22.    Frankford, Powell, BCCS, as well as some non-PHVG physicians sided with PHVG because they all understood that, if they stuck together, they could generate more revenue united as a group.  PHVG also posed the threat of leaving Frankford as a unit if PHVG did not get its way, thereby devastating Frankford's revenue stream.  Thus, Powell and Frankford had a special incentive for conspiring with the other Defendants.

23.    With the motive of recapturing control of the Frankford program, once Quigley had made it vastly more lucrative, the Defendants took multiple actions to squeeze Quigley out and ultimately destroy his career.

24.    After his term as cardiac section head at Frankford ended in 2002, Quigley retained his staff privileges at Frankford, and through earlier established referral relationships, continued to maintain his Frankford cardiac-surgical practice.

25.    At the same time, in 2002, Frankford granted privileges to competing heart surgeons Defendants Metcalf and Priest.  Priest was given Quigley's former title of Head of the Section of Cardiac Surgery.

26.    Likewise in 2002, Defendant Uricchio became head of the Cath Lab at Frankford. He worked in and directed the branch of the Cath Lab that did catheterizations, angioplasty, and stent deployment.

27.    Spielman became Head of the EP or electrophysiological lab, which was another branch of the Cath Lab.  Marinchak, also an electrophysiologist, was appointed to do EP procedures and lead extractions.  In the EP lab, Spielman and Marinchak did diagnostic procedures and were trained to do, and did do, the vast majority of pacemaker implants, including bi-ventricular devices.  Spielman and Marinchak are not cardiac surgeons.

28.    These appointments came with additional money and the power to exclude Quigley from referrals and surgical facilities.  The appointment of this group to department head positions was part of the combination, agreement and conspiracy in restraint of trade.

**B.    Defendants Combine And Conspire To Control The Patient Referral Stream And Exclude Quigley From All Referrals.**

29.    To better understand how Defendants combined and conspired to exclude Quigley from cardiac referrals, it is necessary to understand the stages of cardiac treatment and how a cardiac patient progresses through the health care system.

30.    In general, the providers of cardiac care consist of general cardiologists, interventional cardiologists (Urrichio), electrophysiology cardiologists (Spielman and Marinchak), and cardiothoracic surgeons (Quigley, Metcalf, Priest, Pym).  Each type of physician, in the order listed, requires more training.  Each can perform more types of procedures or more complex procedures and submit higher billings.

31.    A cardiac patient generally enters the cardiac care system either through the emergency room or his primary care physician.   In either case, when a cardiac issue is identified, the patient is referred to a cardiologist.   If he is referred to a general cardiologist, he may be referred again, to an interventional cardiologist for further testing or a catheterization or to an electrophysiology cardiologist for different testing or procedures.  He could even be referred between the interventional and electrophysiology cardiologists.  Ultimately, he may be referred

to a cardiothoracic surgeon.  Although the cardiothoracic surgeon is at the top of the professional hierarchy, he is at the bottom of the referral stream, completely dependent on other cardiologists for a flow of patients.  He can be excluded from business by a diversion of the patient at any point along the way.

32.     Defendants' goal was to control the patient from the earliest possible stage, doing the general cardiology, if possible, but if not, the subsequent care, diagnoses or treatment ("PHVG" – that is, Urrichio, Spielman, or Marinchak), the catheterizations ("PHVG"), and bi-ventricular implants ("PHVG") and surgeries ("BCCS" – that is, Metcalf and Priest – and Pym).  At every opportunity, the Defendants, through their combination and conspiracy, made efforts to divert the referral stream to themselves.   Once captured, it was Defendants' goal that the patient never leave their care.   Thus, even if an emergency room or primary care physician or general cardiologist preferred, or even a patient preferred, Quigley, the patient would not, if Defendants had their way, ultimately receive Quigley's surgical care.

33.     The flow of patient referrals, as Defendants intended to direct it, is illustrated and then described more completely below.   It was Defendants' goal to choke off the referral flow to Quigley represented by the gray, interrupted lines in the chart below.



34.     If a cardiac patient entered the system through the Frankford emergency room and he was referred to one of the Defendant cardiologists, they would cut Quigley out immediately, in the event the patient needed a pacemaker or surgery.  (See Referral Flow-Chart.)  If he needed a bi-ventricular pacemaker, he would, under Defendants' combination and conspiracy, be referred to Spielman and Marinchak of PHVG.   If he needed surgery beyond the implantation of that device, he would be referred to Metcalf or Priest of BCCS.  Or if one of Spielman's or Marinchak's procedures required a surgeon's backup, they would refer the case to Pym.

35.     If a general, non-interventionist cardiologist other than one of the Defendants treated a patient and wanted to refer the patient to Quigley, Defendants, at times, still ensured that Quigley would be excluded.  In that case, if the patient was seen at Frankford, he would have to go to the Frankford Cath Lab run by Urrichio.  Then, if his treatment continued and the general cardiologist did not have an interventionist in his group, instead of seeing Quigley for a pacemaker implant or surgery, he would be sent to Spielman or Marinchak for a device (i.e., bi-ventricular implant) or to Metcalf or Priest for other implants or surgeries.  (See Referral Flow Chart.)

36.     This consistent pattern did not arise by happenstance.  Defendants agreed, combined, and conspired to create it, and once it was established, to perpetuate it and drive Quigley out of practice and out of business.  Even the Frankford administration acted to ensure that the Defendant physicians were entrenched and Quigley was marginalized and excluded.

37.     Moreover, Defendants pursued their anticompetitive objective not by an agreement on referrals alone but by a host of additional joint, agreed-upon anticompetitive, exclusionary acts, such as excluding Quigley from Frankford's state-of-the-art surgical facilities, trying to cut off his access to pacemakers, and a series of other acts described more fully below.

That patient care was compromised or health threatened was less important to Defendants than eliminating Quigley's competition.

38.     Further, by diverting the patient referrals to themselves and excluding Quigley, Defendants co-opted both patient choice and the preference of non-defendant referring physicians who may have preferred Quigley.

39.     Defendant Pym, although not a member of PHVG or BCCS, served as a back-up or emergency surgeon for Spielman and Marinchak.  He agreed and acted to enforce the dominance of PHVG and BCCS in exchange for the work the other Defendants referred to him.

40.     By late 2004, Defendant Roberts agreed to refer patients into the Defendants' system, and never to Quigley, to benefit the PHVG cardiologists, who, in turn, rewarded his wife, Frankford's Intensive Care Unit (ICU) physician Mary Ann Devine ("Devine").  After Devine was hired as Director of Frankford's ICU, the Defendants combined and conspired to reward Devine in exchange for Roberts' referrals.  They did so by designating Devine as the exclusive consulting intensive care physician on cardiac cases.  Devine's consultation, though convenient, was usually medically unnecessary and duplicative, and therefore a fraud on health care insurers.

**C.    Defendants Establish, And Then Exclude Quigley From, A State-Of-The-Art Heart Center.**

41.     At the same time Defendants were systematically elevated to department heads in 2002, Frankford planned to open a new state-of-the-art Heart Center, which was expected to produce significant revenues for the hospital.  The physicians appointed to run the new Heart Center included those already identified as department heads and a few others: Uricchio (Head of the Cath Lab), Spielman (Head of the Electrophysiology Lab), Metcalf (Head of Cardiac Surgery), Roberts (Head of Chest Pain Clinic), his wife Devine (Head of ICU), and PHVG

11

general cardiologist Robert Schlessinger (Head of Cardiology).   That no one else was appointed

by Frankford and/or Powell demonstrates Defendants' commitment – their combination,

conspiracy, and agreement – to secure the dominance of the column A on the Referral Flow

Chart, to exclude Quigley, and drive him from the hospital.

42.     The Heart Center Electrophysiology Lab and its state-of-the-art surgical suites

were available to Spielman and Marinchak for bi-ventricular implants, cardiac lead extractions,

and to Metcalf and Priest for other surgeries, but Defendants combined, agreed, and conspired to

bar Quigley, and did bar Quigley, from these facilities for the purpose of device implantation.

Their conduct affected not just Quigley but patients, whose freedom of choice and quality of care

was compromised without their knowledge.

**D.      Defendants Combination And Conspiracy To Exclude Quigley Manifests Itself In Multiple Ways.**

43.     The Defendants exclusionary, unlawful conduct, included but was not limited to,

the following acts:

- Defendants combined, agreed, and conspired to refer cases between the Defendant physicians to the exclusion of Quigley, even if the primary care physician or general cardiologist or anyone else at the front end of the referral stream preferred Quigley.

- Frankford COO Gene Johnson acting on behalf of Defendant Frankford, advised hospital cardiologists to refer their surgeries not to Quigley but to Metcalf and Priest.  He also advised emergency room doctors to refer cases to Uricchio, Spielman and Marinchak, in which case any required surgery would be referred to Metcalf or Priest.

- Defendants Frankford, Uricchio, and Spielman banned Quigley from using the state-of-the-art Cath Lab at Frankford, where physicians typically implanted cardiac devices, such as pacemakers and defibrillators.

12

- Defendants Frankford, Metcalf, and Priest banned Quigley from Frankford's state-of-the-art operating suites for the purpose of implanting cardiac devices and forced him to perform implants in the general OR with the untrained general OR staff.  Consistent with the boycott, Metcalf and Priest, ironically, allowed Marinchek and Pym unlimited use of the state-of-the-art surgical suites, complete with highly trained surgical staff for all pacemaker lead extractions, which are typically performed in a cardiac Cath Lab.

- Certain Defendants combined, agreed, and conspired to deprive Quigley of the surgical support staff available to Metcalf and Priest.

- Defendants Metcalf and Priest refused to cross cover for Quigley, intentionally jeopardizing his staff privileges and thereby securing their position as the dominant cardiac surgeons.

- Despite repeated complaints from Quigley, Frankford and its CEO, Defendant Powell permitted all of such conduct specified above. Indeed, in a classic Catch-22, when Metcalf and Priest refused to cross cover for Quigley, Powell advised Quigley that he must resign from Frankford for a lack of cross-coverage.

- With the sole purpose of driving Quigley from Frankford, Frankford administrators and Defendant Powell conducted a series of unmerited, pretextual "peer reviews," not authorized by Frankford's Bylaws or other established policies, imposing continued "discipline" on Quigley when there was no basis for discipline.  No Defendant underwent similar scrutiny despite committing egregious acts such as intimidating and threatening medical device salesmen and preventing them from supplying medical devices to a colleague and therefore to Frankford patients, creating an exclusive referral arrangement, denying Quigley surgical staff, transferring patients to avoid consulting, inviting a surgeon's minor daughter into the OR to photograph open heart surgery for a school project, or abandoning patients immediately after surgery as their condition deteriorated to a critical status or otherwise becoming suddenly unavailable for immediate post-op complications.

- Defendants Spielman, Marinchak, Roberts, and Pym successfully conspired to interfere with Quigley's implantation of a bi-ventricular pacemaker to the point of risking a patient's life.  This incident was part of a combination and conspiracy intended to cause device manufacturers to boycott Quigley.  Their motive was to prevent Quigley from further eroding what had been their 95%

13

market share for these types of surgeries. They threatened two device manufacturers, Medtronic and St. Jude, with a boycott should they supply Quigley with a device for an October 19, 2005 operation. While Defendants were thus intimidating the device manufacturers and a pacemaker was therefore unavailable, Quigley's critically-ill patient was anesthetized and awaiting surgery. Frankford CEO Defendant Powell had direct and immediate knowledge of these egregious and dangerous acts yet failed to suspend any of these individuals for this conduct.

- In October 2006, Metcalf defamed Quigley by falsely reporting that Quigley "interfered" with Metcalf's cardiac surgery by entering the surgical suite and verbally abusing and threatening Metcalf while Metcalf's patient was undergoing surgery. In fact, it was Metcalf who had interfered with Quigley's scheduled surgery. Quigley had been previously scheduled to conduct a complex surgery before Metcalf's non-emergent, elective surgery. Quigley had rehearsed the surgery with team members, including Frankford's only Physician Assistant, Richard Kang. But without communicating to Quigley, Metcalf bumped himself ahead of Quigley and co-opted Kang for his non-emergent surgery. Quigley did what any surgeon in the same situation would reasonably be expected to do. Already in the operating suite and dressed in full mask and scrubs, he crossed from his operating room, # 1, to operating room #2, and opened the door to the non-sterile zone and inquired when Kang would be available to assist in Quigley's previously scheduled complex mitral valve case since the patent was on the OR table. Metcalf used this innocuous and reasonably expected inquiry as an occasion to defame and undermine Quigley by making an immediate, false report of interference with patent care.

- In response to Metcalf's false report (for which Metcalf is a defamation defendant in the State Action), Defendants Powell and Frankford, without a proper investigation, and in violation of Frankford's Bylaws and Policy on Appointment, Reappointment and Credentialing, temporarily suspended Quigley four days after the above event for creating "an imminent danger." Frankford decided to act swiftly and harshly despite its history of ignoring or electing not to punish or address physicians who truly placed patients' care in jeopardy. Despite the Policy's requirement that Frankford administrators speak with Quigley prior to suspension, Frankford and Defendant Powell did not do so, even though Quigley made himself available over the course of two days. The Medical Executive Committee then conducted an independent investigation, determined that the suspension was wrongful, and

after 24 days, lifted it.[2]  It also recommended that the suspension be expunged from Quigley's record.

- Despite the Medical Executive Committee's recommendation, Frankford has refused, regardless of Quigley's numerous oral and written requests, to expunge the suspension from Quigley's record. As Defendants were aware, Quigley had to report the suspension on every application for employment, for privileges and credentials, for malpractice insurance, for professional societies, and for professional licenses.  He continues to be severely damaged by what is acknowledged to be an improper suspension and, further, by Defendants' vindictive refusal to correct his professional record, despite multiple verbal and written requests to do so.  The bogus suspension must be reported on the CAQH Universal form required by third-party payors, which is retrievable by any employer.  Even if expunged, it will forever harm Quigley, preventing him from obtaining the leadership position he had sought and would otherwise continue to seek.[3]

- On information and belief, in an effort to harm Quigley, Defendants combined, agreed, and conspired to make false statements about Quigley to potential employers and to other staff members and colleagues concerning the wrongful suspension and other matters.

- Urrichio posted a daily cath lab schedule identifying only Metcalf and Priest as on-call surgeons, excluding Quigley.

- Defendants combined, agreed, and conspired to manipulate operating room scheduling to their benefit and to the exclusion of Quigley.

- PHVG physicians agreed to advise, and did advise, general cardiologists not to refer to Quigley.

44.   Representative of the lengths to which Defendants went was the conspiracy to deprive Quigley not just of operating facilities but of pacemakers.  At a minimum, Defendants

---

[2]      The imposition of the suspension, when truthful exculpatory information was fully available to Frankford, reflects a disregard not only for Quigley's welfare but for that of his patients.  Defendants, in their haste to eliminate Quigley as a competitor, failed to institute a contingency plan and Quigley had to orchestrate patient care from his home.

[3]      Every application asks, "Have you ever been suspended?"

Spielman, Marinchak, Roberts, and Pym combined, agreed, and conspired with, and threatened, pacemaker manufacturers as part of their boycott attempt. Their involvement was documented by a Medtronic's sales representative, whose notes were recently obtained through a subpoena in the State Action.

45.     The regional Medtronic's salesman, David Passione, was so shocked by what occurred that he kept a contemporaneous log, beginning October 18, 2005.

46.     At the time, Quigley was a highly trained cardiothoracic surgeon with full cardiac and thoracic surgical privileges at Frankford. Having had 15 years of pacemaker implantation privileges, including privileges at Frankford, he had been asked by several independent cardiologists to expand his range to include bi-ventricular pacemakers. During Quigley's first scheduled Medtronic bi-ventricular implant, he made the intraoperative, clinical decision to downgrade to an internal cardiac defibrillator. Without any authorized medical knowledge, and despite not being cardiac surgeons, Defendant Roberts and his colleagues arbitrarily, and in order to further harm Quigley, labeled this implant a failed bi-ventricular implant.

47.     With the knowledge that Quigley had added this device to his pacemaker repertoire and that he would therefore compete with the dominant group at Frankford, Roberts, who favored the dominant group, pressured Passione to deny Quigley access to Medtronic pacemakers. According to Passione's notes, he told Passione, "I am not happy your company was involved."

48.     Marinchak then added that fault lies not with Medtronic but with the physicians referring cases to Quigley, meaning the non-PHVG cardiologists outside of the dominant group's referral stream. Marinchek was laying the blame – i.e. the "fault" – for Quigley's continuing to

work at Frankford on those physicians who did not participate in the unlawful, anti-competitive conduct that is the subject of this suit.

49.    Spielman, a staff cardiologist who had no supervisory or privileging power over a cardiac surgeon, such as Quigley, in furtherance of the combination, agreement, and conspiracy, telephoned from California directly to the Frankford EP lab and repeatedly questioned Passione, while Marinchak and perhaps Roberts were present.  He asked Passione about Medtronic's policy (if any) on supplying an implant to an "unqualified" physician, suggesting falsely and without any authority whatsoever that Quigley was unqualified.

50.    Passione responded that it is not Medtronic's responsibility to assess physician qualifications.  In a further threat to Passione and Medtronic, Spielman stated that he wanted to meet with Passione's regional manager on Monday, the next business day, after Spielman had returned from California.   Passione then questioned Spielman's longstanding use of Pym, a backup cardiac surgeon participating in the PHVG combination, for it was inconsistent to use Pym if Quigley seemed unqualified.  Spielman said he had asked Pym to stop doing the bi-ventricular implants, which Spielman does, because he sends Pym other work.   In other words, Spielman and Pym made an anti-competitive agreement, and Pym participated in PHVG's combination, agreement, and conspiracy to corner the market.

51.    Attempting to exert further pressure, Spielman told Passione that certain guidelines are espoused by the Heart Rhythm Society.  In truth, the Heart Rhythm Society is a voluntary professional organization for cardiologists whose authority is not binding.  Spielman also threatened Passione that Medicare would not pay for procedures by unqualified physicians. He then demanded something in writing on Medtronic's position on supporting the implant procedure conducted by Quigley.

52.     Before leaving the hospital, Passione asked Roberts what Medtronic should do if he got a call for another case on Wednesday.  Roberts, replied, "If I were you, I would walk away."  Roberts, a staff cardiologist with absolutely no supervisory or privilege power over cardiac surgeons, including Quigley, had no authority to determine what procedures Quigley performed and no business discussing Quigley's qualifications or caseload.

53.     Before leaving the hospital, while sitting in his car on Tuesday night, Passione retrieved a voicemail from Pym.  Pym was dependent on other Defendants for the occasional overflow or emergency surgical cases, the same cases from which they have deliberately excluded Quigley.  Pym cooperated with the other Defendants by not doing bi-ventricular implants and taking business from Spielman and Marinchak or by competing with Metcalf or Priest for surgeries.  He performed less than 30 cardiac surgeries a year at Frankford, even though 50 open heart surgeries were required to maintain privileges; Defendants ignored Pym's non-compliance in order to exclude Quigley from the cases Pym received.  Among other things, Pym said to Passione:

> You may have limited your access to Frankford Hospital.
>
> If this blows up and I cannot implant devices I will personally go bankrupt, but I guess you don't care about that, do you?
>
> If that happens, I will never use another F–ing Medtronic device again.
>
> As a Medtronic Star of Excellence M.D., I will call my colleagues to tell them what happened.

54.     Passione replied that Medtronic did not want to be part of the problem after being shut out for the last year, referring to the arrangement Frankford had with competitor cardiac device company Guidant and possibly St. Jude.  He said that Medtronic did nothing more than show up for Quigley's case.

55.    Pym then accused Passione of shirking responsibility: "Like Donald Rumsfeld said about the war – stuff happens."

56.    He went on to defame Quigley, saying that Quigley killed 11 of 44 patients at Einstein and they ran Quigley from Einstein.

57.    He asked if Passione was showing up for Quigley's case the next day.   Passione said, "I'm not so sure."  Pym replied, "Well, I'm relieved to hear that.  In fact, I have some business for you on Thursday."  The suggestion was that if Medtronic refused to boycott Quigley, Pym would then boycott Medtronic.

58.    The pressure the Defendants placed on Passione had an effect, for, as Passione himself noted, he called Quigley at around 10:00 p.m. and told him that he is "getting tremendous heat" about doing the next day's case with Quigley.  He said that Quigley should look to Medtronic's competitors, St. Jude or Guidant, for his next two implants.

59.    But the instant Defendants, with no regard for the patient, wanted to foreclose even the door that Passione tried to leave open for Quigley.   Passione noted that his assistant, Ken, overheard Roberts call the St. Jude representative and say, "You may get a call today to do a bi-v implant.  It would be in your best interest not to do the case."  The case he was referring to was Quigley's.

60.    Roberts call had an impact.  The next day, Quigley's patient was anesthetized and Quigley was ready to begin surgery when the St. Jude representative's supervisor, exactly as written in Passione's notes, called the representative who was present in Quigley's operating room and told him not to proceed.  Through Quigley's rescue efforts, calling Frankford CEO Powell, however, that decision was reversed and St. Jude returned to participate.  Ironically, a third company, Guidant was in the hall and ready to assist.

61.    Later, Marinchak called Passione on his cell phone in an effort to cover up the Defendants' conspiracy to deprive Quigley of pacemakers.  Marinchak asked Passione if he was threatened or intimidated by any of Marinchak's comments.  This remark was intended to pressure Passione to agree that he had not been threatened or intimated and ensure that Marinchak and others would be clear for the call that Marinchak knew Passione would be receiving.  When Passione said he was not threatened or intimidated, Marinchak told Passione that he could expect a call from Frankford CEO Powell.

62.    Indeed, according to Passione's notes, Powell called Passione later in the day.  Passione took his cell phone to his car for privacy.  Powell asked if he had been intimated in any way.  Feeling that he had been, Passione said he would rather meet Powell in person and told him about Roberts' comment that Passione should "walk away" if asked to provide a device for Quigley's surgery.[1]

63.    This is just a sketch of the type of conduct Defendants engaged in with the objective of removing Quigley as a competitor.

**E.    Damages**

64.    With his education and training, his triple board certifications and re-certifications, his extensive bibliography, his seven years as Chairman of the Cardiothoracic Surgery Division at Einstein, his experience building the heart program *de novo* at Frankford, and a national reputation with unrivaled credentials, Quigley was positioned to secure a top leadership position, such as Chairman of the Department of Surgery, at a major teaching hospital.

---

[1]    Some of the notes were redacted by Medtronic and therefore the full conversation with CEO Powell is still unknown.

65.     Quigley's earnings were commensurate with such a leadership position -- until Defendants' anticompetitive conduct began to take a toll.    Below is a summary of Quigley's annual income, showing the drop due to Defendants' conduct:

| 1998 | 1999 | 2000 | 2001 | 2002 |
|------|------|------|------|------|
| $802,000 | $1.038 million | $1.048 million | $1.077 million | $1.054 million |

| 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|
| $1.139 million | $1.784 million (Includes pay-out on Einstein contract.) | $701,000 (Includes pay-out on Einstein contract.) | $430,000 | $300,000 |

66.     When his contract with Einstein expired at the end of 2004, his objective was to transition to such a position.  He applied for multiple leadership positions, submitting, over time, hundreds of job applications.  He had multiple interviews and was avidly pursued by some of the best hospitals.

67.     Nevertheless, as a direct and proximate result of the wrongful conduct described herein, Quigley was prevented from obtaining such a position.   There are a number of ways in which the Defendants conduct caused the loss of Quigley's desired career opportunity.  In general, however, Defendant's unlawful conduct besmirched his reputation at the very moment he needed to rely on it.  For example, the refusal of the Defendants who were division heads at the new heart center to refer him cases and the wrongful suspension made it appear as if something was wrong with Quigley, that he had gone sour as a surgeon, when, in fact, it was Defendants' unlawful boycott that was the problem.  By convention, it is the division heads whom prospective employers always contact to seek information on the applicant.

68.     As a result of Defendants wrongful conduct, Quigley has lost millions in income alone.

**Count I – Per Se Violation of Section I of the Sherman Act – Improper Refusal To Deal**
***Quigley v. All Defendants***

69.     Quigley incorporates by reference all paragraphs of the Complaint as if set forth fully herein.

70.     Defendants, Urrichio, Metcalf, Priest, Marinchak, Spielman, Roberts, Pym, PHVG and BCCS are, both individually and in combination, competitors of Quigley.

71.     On information and belief, Defendants Frankford and Powell derived economic benefit from participating in the conduct described herein.  By allowing, encouraging, and promoting the exclusionary conduct of the other Defendants, Frankford obtained the revenue derived both directly and indirectly from the large volume of cardiology and cardiac surgery patients.

72.     Defendants combined, conspired and contracted among themselves and with co-conspirators to prevent Quigley from practicing cardiac surgery and/or to impede Quigley in the practice of cardiac surgery.  Defendants did so with the motive of restraining trade and securing more revenue to themselves.

73.     The individual Defendants (Powell, Uricchio, Metcalf, Priest, Marinchak, Spielman, Roberts, and Pym) acted for their own interests apart from the lawful interests of Frankford, PHVG, and BCCS.

74.     In furtherance of this combination and conspiracy, each defendant did one or more of the following:

           a.     On information and belief, agreed to eliminate Quigley as a competitor;

22

b.      Agreed to deprive Quigley, and did deprive Quigley, of the facilities, equipment, and staff necessary to conduct state-of-the-art implantation;

c.      Afforded Quigley access only to second rate surgical facilities and equipment for device implantation while reserving state of the art facilities and equipment for themselves;

d.      Agreed, combined, and conspired not to refer cases to Quigley and to divert patient referrals away from Quigley and to themselves;

e.      Agreed, combined, and conspired to issue and/or did issue threats among themselves or with others not to refer cases to Quigley;

f.      Agreed not to cross-over for Quigley;

g.      Violated Frankford's bylaws and established policies and breached the terms under which Quigley was employed at Frankford by conducting a series of unmerited "peer reviews" and by disciplining Quigley and otherwise harassing and impeding him in the performance of cardiac surgery at Frankford;

h.      Combined and conspired with cardiac device manufacturers to make such devices more difficult or impossible for Quigley to obtain;

i.      Combined and conspired with each other to make cardiac devices more difficult or impossible for Quigley to obtain;

j.      Threatened and intimidated cardiac device manufacturers and combined and conspired to threaten and intimidate cardiac device manufacturers to make such devices difficult or impossible for Quigley to obtain;

k.      Combined, conspired and/or agreed to pressure or coerce pacemaker and device manufacturers to deny Quigley access to these essential medical items;

l.      Combined and conspired to impede and prevent Quigley's scheduling surgeries or proceeding with scheduled surgeries;

m.      Published false and defamatory reports about Quigley and/or combined and conspired to spread false and defamatory reports, including but not limited to, Metcalf's statement that Quigley had improperly interfered with Metcalf's surgery;

n.      Published defamatory reports and/or combined, agreed, and conspired to publish defamatory reports regarding Quigley's qualifications to perform bi-ventricular pacemaker implants.

23

o.   Improperly suspended Quigley and/or combined and conspired to suspend Quigley;

p.   Refused to expunge the improper suspension and/or combined and conspired not to expunge the improper suspension.

75.   Through the conduct described above, and, on information and belief, additional acts, Defendants herein combined, conspired, and contracted with and among themselves and with others to deprive Quigley of referrals, equipment, facilities and personnel necessary to his providing cardiac care and cardiac surgical services.

76.   Defendants were effective in denying Quigley the necessary referrals, equipment, facilities, and personal.

77.   This conduct constituted a boycott that excluded Quigley from the provision of cardiac care at Frankford.  As such, it constitutes a *per se* violation of § 1 of the Sherman Act.

78.   Notwithstanding that Defendants' conduct constituted a *per se* violation and proof of an anti-competitive effect is not required, Defendants' combination and/or conspiracy was an unreasonable restraint on trade and produced anti-competitive effects.

79.   For all antitrust purposes, the relevant product market is the provision of cardiac surgery and cardiac device implantation.  The relevant geographic market is northeast Philadelphia.

80.   The objects of the conduct and/or conspiracy were illegal.

81.   Defendants' combination and/or conspiracy had an effect on interstate commerce in that the Frankford heart program is supplied by multiple out-of-state vendors and vendors that conduct interstate business.  Specifically, for example, the cardiac device manufacturers that are the subject of this lawsuit are not residents of Pennsylvania and/or conduct interstate business.

Further, Defendants receive payment from Federal funds, and Frankford and the Frankford heart program attempt to attract, and have treated, out-of-state patients.

82.     As a direct and proximate result of said conduct, Quigley has been injured.

**WHEREFORE**, Quigley prays for the relief specified in the Prayer for Relief.

### Count II – Violation of Section I of the Sherman Act – Non-*Per Se* Combination and Conspiracy
### *Quigley v. All Defendants*

83.     Quigley incorporates by reference all paragraphs of the Complaint as if set forth fully herein.

**WHEREFORE**, Quigley prays for the relief specified in the Prayer for Relief.

### Count III – Interference With Contractual Relations
### *Quigley v. Marinchak, Spielman, Roberts, and Pym*

84.     Quigley incorporates by reference all paragraphs of the Complaint as if set forth fully herein.

85.     Quigley had contractual and business relations with numerous patients during the time period in question.

86.     Quigley had contractual and business relations with suppliers of medical equipment, including but not limited to, suppliers of pacemakers and heart devices, such as Medtronic, St. Jude, and Guidant.

87.     Defendants purposely acted to harm these contractual and business relations.

88.     Defendants' conduct was not justified or privileged.

89.     As a direct and proximate result of Defendants' conduct, Quigley was injured.

**WHEREFORE**, Quigley prays for the relief specified in the Prayer for Relief.

### Count IV – Interference With Prospective Business Advantage
### *Quigley v. Marinchak, Spielman, Roberts, and Pym*

90.     Quigley incorporates by reference all paragraphs of the Complaint as if set forth fully herein.

91.     Quigley had prospective and likely contractual and business relations with numerous patients.

92.     Quigley had prospective and likely contractual and business relations with suppliers of medical equipment, including but not limited to, suppliers of pacemakers and heart devices, such as Medtronic, St. Jude, and Guidant.

93.     Quigley had prospective and likely contractual and business relations with hospitals and potential employers other than Frankford, including but not limited to, possible positions at Kaleida Health, NYU Queens, Harvard University's Mt. Auburn Hospital, Lahey Clinic, Lancaster Regional, Mt. Sinai in Miami, and many others.

94.      Through the conduct described above, Defendants purposely acted to harm the prospective contractual and business relations.

95.     On information and belief, through additional conduct beyond that described above, Defendants purposely acted to harm the prospective contractual and business relations.

96.     Defendants' conduct was not justified or privileged.

97.     As a direct and proximate result of Defendants' conduct, Quigley was injured.

**WHEREFORE**, Quigley prays for the relief specified in the Prayer for Relief.

### Count V – Conspiracy
### *Quigley v. Marinchak, Spielman, Roberts, and Pym*

98.     Quigley incorporates by reference all paragraphs of the Complaint as if set forth fully herein.

26

99.     Defendants conspired among themselves and with unnamed co-conspirators, including but not limited to one or more Defendants in the State Action, to interfere with Quigley's contractual and prospective contractual and business relations.

100.    Defendants conspired among themselves and with other co-conspirators, to prevent Quigley from providing care to cardiac patients.

101.    Defendants combined and agreed with an intent to do an unlawful act or do an otherwise lawful act by unlawful means.

102.    Defendants committed overt acts in furtherance of the conspiracy.

103.    As a direct and proximate result of Defendants conduct, Quigley was injured.

**WHEREFORE**, Quigley prays for the relief specified in the Prayer for Relief.

## IV.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Quigley respectfully requests that this Court enter an Order in his favor and against Defendants:

a.      For compensatory and punitive damages;

b.      For treble damages, costs, attorneys fees, and interest pursuant to 15 U.S.C. § 15;

c.      For such other relief as the Court deems just and proper.

**BOCHETTO & LENTZ, P.C.**

By: _____
    George Bochetto, Esquire
    David J. Perlman, Esquire
    1524 Locust Street
    Philadelphia, PA 19102
    Ph: (215) 735-3900
    Fx: (215) 735-2455

Date: November 26, 2008

27